Mr. Woodard entered into a bargain with the United States in August of 2001. The bargain was that he pled guilty to agreeing with others to possess an unspecified amount of cocaine with the intent to distribute it. The agreement was, to say the least, somewhat unorthodox. It was entered into at a time when Apprende v. New Jersey, governing the rules on sentencing, was relatively fresh. It was entered into before this court decided United States v. Buckland, and of course it was entered into before this court decided United States v. Polliver earlier this year. So both the defendant and the government, and I think the court, were crafting this agreement on somewhat uncharted waters. But the guts of the agreement was that he would plead to all the elements of the charge, with the exception of drug quantity, and he waived his right to jury trial and so forth as to drug quantity, and agreed to submit it to the district court for what was called a court trial. Now part of the plea agreement was that the court trial would consist of, the words that were used was that the government may prove drug quantity by putting in transcripts from a much larger conspiracy trial that had occurred earlier that year involving Mr. Davis and Mr. McCoy. And then of course Mr. Woodard was permitted to put on whatever evidence he chose. The substance of our argument today and in the briefs is that the government did not stick to that argument, and the court found drug quantity in accordance with a trial which consisted of matters outside the record of the Davis trial, and matters that were hearsay, matters that were CEA reports and so forth, and that the evidence that was submitted was insufficient to show that Mr. Woodard, the defendant, actually possessed or had dominion and control over any amount, any definable amount of cocaine or cocaine-based cocaine. Now, passing for the moment the question as to whether this is appealable, so I will assume for purposes of this question that an appeal on the merits is appropriately front of us. Addressing what I think is your first point among those that you just made, this plea bargain that says, I agree that the government may present its proof in the form of transcripts of testimony and exhibits presented during the trial of Davis and McCoy, da-da-da. As I understand your argument, you're reading may as not only an authorization but an exclusive authorization. That is to say that the proof can be only that. Is that correct? That's absolutely correct, Your Honor. Now, how do you get there with the word may and also given the in-court colloquy with Judge Jensen that seemed to me inconsistent with your position? Well, first off, the agreement itself is ambiguous. I mean, just the very use of the word may is ambiguous because we don't know precisely what it meant. It's usually permissive, however, isn't it? It usually is. But what Mr. Woodard was doing was giving permission to the government to prove its case by use of transcripts and evidence from the Davis trial. You're saying that only? He was only doing that? He was permissive in the sense that Woodard, in his side of the bargain, was giving permission to the government to use evidence that had been subject to cross-examination, had been subject to proof, had been subject to the rules of evidence, in another trial. But he was not opening the door to hearsay, to raw police reports, to summaries that were written by the assistant attorney. How do we get that off the face of the plea agreement? It just says may. It doesn't say anything else. It just says may. Well, I understand, but I'm intending that it's an ambiguous may. Well, isn't your real problem that you wouldn't necessarily particularly care whether it was may or not may if he retained his right to make evidentiary objections and to confront and to cross-examine whatever other evidence was put in? Isn't the real problem that it was being read to so that the government could come in with other evidence that's not subject to the ordinary rules of evidence? That is a major problem, absolutely. But the agreement, I mean, all we have is that one sentence in the agreement, which defines Marvin Woodard's future. I mean, that sentence is what drives the... All right, so let me deal with the fact that in the middle of the trial, when the question of making objections to the other evidence came up, the judge said, all right, let's just start all over and have a trial. And then there's this very strange colloquy that goes on, which seems to result in the defendant's lawyer saying, all right, we'll do it your way. Well, that, too, is ambiguous. The way we interpreted that on the code record was that there was a long history in this case. And it's apparent from reading the record that everybody was a little tired of this case and wanted to move it on. And by the time we get to the colloquy that Your Honor is referring to, Woodard's lawyers argue the point. They're saying this term, may, does not permit them to put in the DEA reports and the law police reports and so forth. And they're going back and forth. And Judge Jensen says, that's not the way I want to look at that. I interpreted it. He kind of froze his hands. And he says, we'll go back and start over. So we're going to go into the other evidence. We're going to have to start over. And he basically offers to do it. And then what? And at that point, they say they're going to submit to the court's ruling. And they're going to stop arguing with him, which I am. So wasn't this ruling that I'm going to start over again and have the whole trial? He indicated that. I don't know. It certainly wasn't a ruling. He didn't say, OK, stop. We're starting all over again. Let's have a trial. Let's withdraw the plea and so forth. He went into this colloquy. He was clearly kind of frustrated with the lawyers. The lawyers were frustrated at that point. And I think they did what most lawyers do when they know that the court is getting frustrated with their arguments. And they say, we'll submit. In fact, I think what Mr. Babcock said, we can do it either way. We'll either go with, we're prepared to do whatever your Honor's ruling is. And ultimately, the court's ruling was that he would allow all this information in. And then, of course, the lawyers objected to that. One of the benefits of Nelson's question about the permissiveness and the plea agreement, if I may, the other point that I wanted to raise was the fact that because the plea agreement is unclear as to what this word may mean, the doubt should go to the defendant. I mean, this was an agreement which on page one shows that it was drafted by the United States Attorney's Office. It's clearly it was signed and it was read. And Mr. Woodard's attorney signed it as well. But the usual rules in this court are that where there's an ambiguity in the agreement, it's interpreted in favor of the defendant. But we see plea agreements all the time that are borderline. In other words, the U.S. Attorney's Office in a particular district has a plea agreement and it's almost take it or leave it. You read one in one case and you read it in the next case, it's the same except for the name. This one clearly appears to have been negotiated on this specific case. So even though the U.S. Attorney's Office may have typed it up, it seems to me the contents of it don't indicate a take it or leave it preprinted agreement. Well, it was negotiated. And I think that the colloquy that was occurring before Judge Jensen that Judge Berzon just referred to shows that Woodard's lawyers, certainly Woodard, interpreted this to mean something entirely different. Was Woodard pro se at the time of the plea agreement? No, he was not. Was he? Woodard was always represented by counsel. There was some advisory counsel appointed for him along the way. Now, at the plea hearing, which is where the court considers the plea agreement, there's another discussion. Babcock says after the court tells the defendant you've waived your rights to appeal, Babcock, Woodard's lawyer, steps in and says, if you please, there's a sort of limited appeal waiver we negotiated here. And says, Mr. Woodard's retaining the right to appeal, rulings and judgments the court makes during the course of the court trial. Then the court says, so that during the court trial, you'd be able to appeal anything that you believe has been done improperly by the court. During that trial, you can do that. But other than that, you're giving up your right to appeal. So they had a discussion of what this agreement meant. And nobody seems to question what the government could do during that trial other than Mr. Woodard retained the right to appeal. What happened during that court trial? Well, I think that, if I recall correctly, and forgive me if I'm wrong, but if I recall correctly, that colloquy had to do with a separate section of the plea agreement. And, in fact, there wasn't much discussion other than the colloquy that Judge Berzon pointed to as to what the evidence, what the provisional evidence. Well, I'm sure there was. There was another colloquy where he said, I can consider that, but I can also consider any evidence that you wish to present. Both sides could present other evidence to me. And I would use all my evidence to decide how much trust you involve. So he's specific. This is Judge Jensen at the time of the plea agreement, explaining what he understood in the scope of the trial. So he specifically represented that the government could bring in other evidence. I'm sorry. We read it quite differently. We read it from the standpoint that it was ambiguous, that the ‑‑ Even if it were ambiguous is what I'm saying is that at the plea colloquy, the ambiguity was to some degree clarified. Well, I don't believe it did. It did not ‑‑ it was thrown out in the most general sort of way. The plea colloquy occurs in August of 2001. This trial doesn't occur until way later. I don't think there was anyone who was concentrating on exactly what type of evidence was going to come in, except as it was stated in the plea agreement itself. And that's where the ambiguity came in. I don't think it would have made sense for Woodard to agree to allow raw DEA reports in. In light of the historical background of this case, there was a long trial in the Davis case. The evidence was subject to cross-examination, and there is information in that record where they're talking about the fact that the reason that they allowed that type of evidence in is because it had been subject to cross-examination by defendants with the same interests as Woodard. Right. Are there two slightly discrete questions? One is whether the government was allowed to bring in any evidence in outside the former trial. The second is, if they were allowed to do that, were they allowed to do it without cross-examination and confrontation and evidentiary rules, or was anything else they brought in subject to confrontation and evidentiary rules? Those aren't quite the same questions. And you could read the agreement to allow number two, but not number one. Well, but I think just the fact that we can't tell how to read the agreement is the problem. And it's a backwards set of words. There's no doubt that it's a backwards set of words. We just have one sentence in the agreement which is driving this defendant's life for the next 10 years. And it says may. We don't know what it means. You know, I have to say, I have no trouble understanding it. I'm baffled by your argument. It says may, which is permissive. And the reason they say may is that otherwise that would be a thing that there might be substantial objection to, because he himself is not a defendant. But he has given the permission. Listen, you can bring in stuff from that, and I'm not going to fuss about it. The other thing that might be presented in addition, well, that's going to be subject to the ordinary rules, at least as in some other specification, which is Judge Berzon's second question. But the idea that they could supplement beyond bringing in proof in the form of transcripts during the trial of Davison McCoy seems to me patently obvious, both from the may and from the policy that Judge Berzon just quoted, which I referred to earlier between Judge Jensen and Woodard, at the time of the plea policy. I just don't get it. I don't know whether I'm going to convince you or not, but let's go to the evidence that was put in. And then let's go to the evidence that was put in. I'm going to assume that the government had its chance. The government put on its case. Let's assume that the purpose of the argument, although I'm not going to concede it, that the agreement's clear. What did they prove? They didn't prove the amendment. They didn't prove possession. And they had problems with the chain of custody. So even if they chose, they meaning the United States, chose how it was going to present its case. It could have, under the court's reading of the agreement, they could have put in practically anything subject to the rules of evidence. But they didn't. They only put in these raw reports. They put in scraps of transcripts. And they failed to connect the dots. And that's where the fall off. And that, in fact, really is the problem of the pre-waiver and what is it and what does it reach. Because it seems to me fairly clearly not to reach this evidentiary, this question you had first raised, i.e., whether they could bring in other evidence or not bring in other evidence. But does it reach the ultimate question of whether they had sufficient evidence in the end? I think it clearly does. Because, you know, he reserved his right. He reserved his right to challenge the court's rulings and orders pertaining to drug quantity. And that's what the case is about. It's very unclear what he preserved. He preserved his right certainly to challenge orders in the course of the trial. And it has to meet at the end of the trial because you can't appeal in the course of the trial. So it has to be at the end of the trial. So then the question is, what about a simple sufficiency of evidence question, which is really what you're raising? Was that preserved? Even though it's said he gives up his right to appeal as a conjecture to the judgment of the orders of the court. Well, it doesn't make sense that he would carve out this limited right to appeal and not preserve the right to challenge the most important segment of the whole proceeding, which is, what was the drug quantity? Because it's the drug quantity that drives the sentence. But that's specifically covered in the waiver. I also agree to waive any right I have to appeal my sentence, including the court's verdict on drug quantity. So all that other stuff is a good argument, but the agreement itself specifically covers drug quantity. Except that the sentence before that says that he has the right to reserve, excuse me, has the reserved right to appeal on rulings and orders. I want to reserve some of my time. Why don't you reserve it now, and then you'll hear what the Governor has to say, and then you'll know what to respond to. Thank you. Good morning. May it please the Court. I'm Louis Davis. I'm an assistant U.S. attorney in this district and was responsible for handling, I should say, the post plea proceedings in this matter. You did not draft the plea agreement? I did not. So we're all approaching it from behind the veil. Okay. Let me strike at the heart of some of the issues that the Court has just raised. First, counsel, I think, inadvertently misspoke when he said that the plea agreement has only one statement, which is driving the next 10 years of the defendant's life, and that pertains to the statement regarding the permissive nature of the fact that the Court relied upon the use of the word may as opposed to the defendant's reading of it as a must. And, of course, we agree with the Court's indicated interpretation of this. But in addition, in the same plea agreement, the defendant also agrees to waive his right to confront and cross-examine other witnesses that might have been called to testify about drug wages. And, therefore, our position is to clarify. I mean, that seems fairly extraordinary. And the notion – I can accept the notion that he agreed to allow the government to come in with a trial transcript and to waive his right to confront and cross-examine with respect to anything in the trial transcript. And I would read those two sentences together. But the notion that he also allowed the government to come in with anything else they wanted and to give up his right to confront and cross-examine is a fairly incredible proposition. I mean, they could have just come in with – put somebody on the stand and had him testify, and the defendant couldn't have cross-examined him? Well, that is the import of that provision. But I think in directly responding to Your Honor's question, another question arises, which is why would he have agreed to this procedure? Counsel has suggested that it would have made no sense to do it. And I think it's important to understand the background that prompted him to do this. And the answer is the defendant was looking at the filing of two prior drug felony convictions, which under Section 21 – or, rather, Title 21, Section 851, would have subjected him to mandatory life imprisonment had he gone to trial in the instant case and been convicted. In the alternative, avoidance of plea agreement, both parties agreed that the ultimate sentence he could receive, the maximum sentence, was 151 months, and the least sentence was 120 months. So by entering into this plea agreement, he avoided the draconian consequences of going to trial and being convicted and being sentenced to mandatory life imprisonment. Do you read this as literally saying that the government could have brought in anything else and that in any form and that that person – anything else that was brought in was not subject to confrontation and cross-examination? Well, I do, based on the additional copies that occur between the parties regarding the proffer. Because the sense of the proffer is that once it was received by the court, the court indicated that he was prepared to proceed with the hearing based on the proffer, that that would be a situation in which there wasn't going to be any cross-examination because the proffer couldn't be received on his face. But that was – if that's true, that's because there was a second waiver at that point when the – when the lawyer said – when the judge said, I'll start all over again and the lawyer sort of essentially forgets, but in terms of what this agreement meant when drafted, that's your position, is that correct, ma'am? Yes. But I don't think it's necessary for the court to focus on that aspect of it because what happened at the proceedings was simply that the proffer was introduced. The parties were given a chance to proceed without the proffer at a different type of trial and they rejected that opportunity. But more importantly, I think, is the idea that even if there were error in the interpretation of this agreement, that the error has to have been harmless. And I say that for three reasons. If the court first considers the second paragraph of the plea agreement, that's the one in which Woodard admits that he possessed the intent to distribute an unspecified amount of cocaine during the time period May through June of 98 – excuse me, March through June of 98. And if you add to it the holding in the Thomas case, which counsel advised the court of in its 28J letter, that in the event the government fails to prove such quantity, that the maximum sentence for a defendant would be death, which would follow from an unspecified amount of controlled substance, which in this case would be 20 years. And combine that with paragraph 7, which is what sets up the limitation, no less than 120 months, no more than 151 months. What we have is a defendant who received a sentence less than the statutory maximum for an unspecified amount of cocaine and at the lowest end of the permissible range within the plea agreement. Therefore, even if there were error, he wasn't prejudiced by this error and, in fact, got the ultimate benefit of the bargain that he sought. I should mention that there are two additional arguments that counsel raised that I believe have been mooted by subsequent holdings of this court. Counsel included very briefly the Tolliver case, but I think it's important for me to mention that one of the arguments was that if there were an error regarding the calculation of drug waste, that the government would be precluded from each trial on this matter. Counsel concedes in his 28J letter that under the Tolliver case, the court held that if there's no acquittal following a failure to prove drug quantity, only limitations to the amount of expenses could be imposed, that limitations being the amount for an unspecified amount of the charged drug. The second argument was whether or not Woodard could litigate the search warrant in his case if the companion case of his co-defendants was reversed on appeal on the basis that the wiretaps in that case were unlawful. And we cite in the 28J letter that we just recently filed in the court the unpublished opinion in the McCoy and Davis case, which upheld the convictions and expressly held that the defendants were not involved in a frank hearing. So both those issues, I think, have been proven. Turning, if I may, to a little bit more information about the proper – was filed in December, and it wasn't until April of the following year that the judge became aware at the last minute, as the hearing was about to be conducted, that there was any objection to the proper. And as Judge Berzon correctly pointed out, the judge not only said one time, but two times, at ER 171 and at ER 173, that he was prepared to start the hearing over not considering the proper at all. And then, with respect to what it was that the parties eventually agreed to, I think it bears mentioning that when the defense agreed that the hearing could proceed with the proper, the court then was very clear in saying that the record before it consisted of, I'm quoting, all the submissions that were presented to the court in the appendix that was filed with the proper. That's at ER 174, and the proper itself is at 101 to 158. And contrary to counsel's representations, the most significant part of the proper has to do with the summary of the pager and wiretap intercepts, which occur at the last three pages of the proper, 156 and 158. And those are summaries of evidence that was introduced at the Davis & McCoy trial. So all of the calls and pager information, it's my understanding, were introduced at the underlying trial at Davis & McCoy. So it would have been admissible anyway, even without the proper itself. But as I think the court has noted, there is an issue with the defense late claiming that the proper was improperly received. And you didn't quote the language, but I'm assuming you're arguing then that even if the pre-agreement by itself is ambiguous as to what may or may not be accepted outside the transcript of the earlier trial, when Mr. Wolfe said, excerpt 174, we accept the court's ruling and we are prepared to argue what you've made the record. I was a little garbled in the sentence. He said, listen, that's okay with me. I'm not objecting. I'm fine. Absolutely. And we'll go with what's in that appendix, period. And precisely because it was, the judge specifically explicitly defined what the record was to include the proper and the appendix, which has these pager and wiretap intercept summaries in it. Absolutely. I'm a little baffled by something you said earlier, which seems to me to raise the question of why we're here. He got the 120 months, which is below the end of what he agreed he would get. So why are we here? What would have happened if he had succeeded in what he now wants, or what he wants for the judge with respect to the drug amount? What would be different? Well, I think nothing would be different. I think what he got was exactly what he asked for. And it turns out that in the final analysis, when the parties submitted their sentencing recommendations, the United States recommended 121 months, and the defendant recommended 120 months. So at the last moment, the answer was the drug amounts were 302.5 grams of cocaine base, 250.6 grams of cocaine powder. But the sentence was subject to the minimum mandatory sentence of 10 years. It's important to note here also, Judge Berzon, that Judge Jensen stated that regardless of all the calculations that the parties went through, that he was prepared to depart downward of 120 months regardless of anything else that the parties said. So it was his intent to give the defendant the absolute benefit of the bargain that he struck with the government. And is there any possible outcome of this drug amount trial that could have resulted in less than 120 months? I do not believe so. Because of the minimum mandatory that's at work here, and this amount was actually above the minimum mandatory. So the judge departed within the guideline range according to the agreements of the parties, but stated regardless of what you all had agreed to, he said, I was prepared to depart downward anyway. I didn't need to, he stated, but I was prepared to do so. So I think that basically all the parties agreed as to what the outcome should be if it only led one month. With respect to the last two issues, one had to do with chain of custody and one had to do with the construction of possession. The only person in the chain of custody, in our view, the defendant waived that argument at trial at the bench trial. He raised no evidence, no objections, filed nothing before the hearing, and introduced no evidence of his own, called no witnesses of his own to challenge chain of custody. The only challenge came after the hearing at a time when it was impossible for anything to be done about it at the hearing itself, and only in the form of pro se. Well, it was a plea filed by Defendant Woodard while still represented by counsel. So our position is that that issue is waived by the defendant, but even if deemed not waived, there was more than sufficient evidence to establish chain of custody. At E.R. 102 through 106, 117, 107, 108, and 105, all those combined together show that from the time the agent seized this cocaine that I just referred to earlier in response to Judge Berzon's questions to quantity at the defendant's apartment until the time it was submitted to the laboratory analyst, there was an adequate chain of custody that could not be attacked. It's also important to note that Judge Jensen, on December 4th, 2001, prior to the evidentiary hearing, the bench trial hearing on drug abuse, stated that in his view the drug quantity which the government would be required to prove would be limited to the drugs that were found in Woodard's apartment at the time the first one was executed. And the judge observed that in his view that the link between Woodard and the house could be established by the wiretap case. And third, that our proverbs should include that information. In other words, we should address the issue of the wiretap interceptions and pager insets in our proverbs. And I submit to the Court that with respect to the constructive possession argument, our strongest argument are all the discussions that occurred between Woodard and other members of the conspiracy regarding distribution of cocaine, combined with the cocaine that was found in his house, combined with the driver's license that was found there, the ID card that was found there in his name, and the other 12 or 13 factors that can be found at ER-10 and ER-211. If there are no further questions, I'll submit them at this point. Thank you. I'll try to answer Judge Broussard's question to the United States Attorney regarding what difference it made. It made a big difference. Had the court or this court found that the government had not proved any drug crime because of a failure of proof, regardless of whether the evidence was admissible or inadmissible, then the sentencing judge would have to look at the sentencing guidelines as to what the proper sentence is for an undetermined amount that is less than, I think it's 500 grams of cocaine and so forth. And under the guidelines, he would be sentenced not for under the provision that he was in fact sentenced, under the 841B1A. He would in fact be sentenced under statute section 841B1C, which is the provision which provides the unspecified amount. And under the guidelines, the sentencing guidelines, his base level would be a level 12 under guideline 2. What did you want to say? His base level would be a base level 12 under guideline 2D1.1C14, which is the guideline provision which governs an unspecified amount. So there's a big difference between a base level of 12 and a base level of 30. But how does that argument square with paragraph 7 of the agreement? That paragraph says, the parties of abuse each may move for any adjustments, so that I may move for a downward departure on any grounds, so long as my sentence will not be less than 120 months or more than 151 months. Now, do the qualifiers in that sentence leading up to 120 months say that only under certain circumstances is there a minimum sentence of 120 months? Or do I say, listen, it says no matter what happens under this agreement, no matter anything that goes on here, 120 months is the minimum. I'm tempted to read it in that second way that says, listen, the minimum sentence is 120 months under this program. I understand. That's what it says. But the role of the district judge at that point, at the point where the district judge has held the trial, has considered the evidence, and has said the government has failed in its fruit, then I submit that the proper role of the district judge is to reject the agreement. Because he wouldn't have been subject to a mandatory minimum at that point. Excuse me? He would not have been subject to a mandatory minimum if he had fled to an unspecified amount. No, because he would have fled under subsection C, which has a mandatory maximum of 20 years. Or a non-mandatory minimum. Mandatory minimum. So what I'm suggesting is that if it was the district judge that at that point should have said, I cannot fulfill this agreement because there is no drug quantity that has been properly approved by the United States, and then the plea agreement says what happens? The government has the opportunity to pull out. And Mr. Woodard has to accept that. But I don't think that, and my second point on harmless error, and then I'll sit down, is that there would be no factual basis for the plea at that point. Because there would have been, he would have fled to this conspiracy to possess with an intent to distribute, but the court would have made a factual finding that the government had failed in its showing that there was any amount. And it probably wouldn't matter because he had already pledged it. Well, except that the court is not supposed to accept pleas that are not supported in the factual basis. Thank you, Your Honor. Thank you very much. I think both counsels agree with this whole argument. The case of United States v. Woodard is now submitted. Thank you. The court will be in recess for 10 minutes. And when we reconvene, we will reconvene with Stoddard v. Adams, 20 minutes per side. Thank you. Thank you. Thank you.
judges: T.G. Nelson, W. Fletcher, Berzon